UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
LION-AIRE CORP.,

                    Plaintiff,                <u>MEMORANDUM & ORDER</u>
                                            19-CV-3554(JS)(ARL)

      -against-

LION AIR INSTALLATION, INC.,
HOWARD MCCARTHARAN, and CHRIS LAMBOT,

                    DEFENDANTS.
--------------------------------------X
APPEARANCES
For Plaintiff:      Lewis Donald Prutzman, Esq.
                  Alyssa C. Goldrich, Esq.
                  Tannenbaum Helpern Syracuse & Hirschtritt, LLP
                  900 Third Avenue
                  New York, New York

For Defendants:     Gerald D. Grunsfeld, Esq.
                  Lazar Grunsfeld Elnadev LLP
                  1795 Coney Island Avenue
                  Brooklyn, New York 11230

SEYBERT, District Judge:

        Plaintiff Lion-Aire Corp. ("Plaintiff") initiated this action against defendants Lion Air Installation, Inc., Howard McCartharan ("McCartharan"), and Chris Lambot ("Lambot") (collectively, "Defendants"), alleging trademark infringement and false designation under the Lanham Act, deceptive acts and practices and trademark dilution and injury to business reputation under the New York General Business Law, and trademark infringement and unfair competition under New York common law. (<u>See</u> Compl., D.E. 1.) Currently pending before the Court are (1) Defendants' motion to vacate the Clerk's Certificate of Default issued on

October 22, 2019 (Default, D.E. 17; Defs. Mot., D.E. 19; Defs. Br., D.E. 19-6; Defs. Reply, D.E. 27-10); and (2) Plaintiff's opposition and cross-motion to enforce a settlement agreement and for an Order striking Defendants' Answer and Counterclaims as untimely (Pl. Mot., D.E. 20; Pl. Br., D.E. 23; Pl. Reply, D.E. 28). For the following reasons, Defendants' motion is GRANTED and Plaintiff's Motion is DENIED.

<u>BACKGROUND AND PROCEDURAL HISTORY</u>[1]

Plaintiff initiated this trademark infringement action on June 17, 2019 alleging that Defendants' use of a trademark and logo for HVAC contracting services is "confusingly similar" to Plaintiff's trademark and logo for HVAC contracting services. (<u>See generally</u> Compl.) Shortly thereafter, Defendants' counsel contacted Plaintiff's Counsel to discuss settlement. (Grunsfeld Decl., D.E. 19-1, ¶ 1; Prutzman Decl., D.E. 21, ¶ 9.) On July 12, 2019, Magistrate Judge Arlene R. Lindsay extended the time for Defendants to respond to the Complaint to August 30, 2019. (<u>See</u> July 12, 2019 Elec. Order).

The parties engaged in negotiations through July 2019. (Grunsfeld Decl. ¶¶ 1-3.) On July 31, 2019, Defendants' counsel stated that his "client has decided it is willing to stop using

---

[1] The facts are recited herein as relevant to the issues before the Court and are drawn from the Complaint and the parties' filings.

Lion and the Lion logo/image altogether" and that "[o]nce we have an agreement in place, my client will take immediate steps to shift his business to a new name." (July 31, 2019 Email, Prutzman Decl., Ex. 5, D.E. 21-5.) Defendants' counsel asked Plaintiff's Counsel to draft an agreement. (July 31, 2019 Email.) The parties exchanged drafts of a settlement agreement and continued negotiations through August 2019. (Grunsfeld Decl. ¶ 4; Prutzman Decl. ¶¶ 13-15.) Neither party provided the Court with copies of the draft settlement agreements. On August 23, 2019, Plaintiff's Counsel agreed to extend Defendants' time to answer the Complaint beyond August 30, 2019, but not indefinitely. (Aug. 23, 2019 Email, Grunsfeld Decl., Ex. A., D.E. 19-2.) Defendants' counsel responded but "accidentally forgot to reply affirmatively" to the extension offer. (Grunsfeld Decl. ¶ 8.)

Negotiations continued and, according to Plaintiff, two issues remained in dispute by September 19, 2019: (1) the time for Defendants to wind down their use of the "infringing domain name" and (2) Defendants' use of trademarks including "LION" and "INSTALATLIONS" for businesses other than HVAC contracting. (Prutzman Decl. ¶ 15.) On September 25, 2019, Judge Lindsay scheduled an initial conference for October 23, 2019. (Initial Conf. Order, D.E. 13.) At this time, Defendants still had not filed an answer and Plaintiff did not request a certificate of default. On October 7, 2019, Defendants' counsel purportedly left

Plaintiff's Counsel a voicemail saying: "[w]e finally have a resolution" and that his client "agreed to the terms so you'll have his website active for maximum of 2 months . . . [i]f you want to draft up the final version, hopefully we can get this squared away within a day or two" (the "Voicemail").[2] (Prutzman Decl. ¶ 16.)   The same day, Plaintiff's Counsel made "minor revisions" to an existing settlement draft and emailed Defendants' counsel a "final draft" (the "Final Draft"). (Prutzman Decl. ¶ 17; Oct. 7, 2019 Email #1, Prutzman Decl., Ex. 8, D.E. 21-8; Final Draft, Prutzman Decl., Ex. 8, D.E. 21-8, at ECF pp. 3-13.)

          Defendants' counsel then requested to remove Lambot from the Final Draft because Lambot "is just a salesman and [McCartharan] does not feel comfortable showing this to his salesman." (Oct. 7, 2019 Email #2, Prutzman Decl., Ex. 9, D.E. 21-9.)   Plaintiff objected and stated that Lambot "needs to be a party to the settlement."   (Oct. 7, 2019  #2  Email.)   On October 16, 2019, Plaintiff's Counsel asked Defendants' counsel "where we stand on the settlement."   (Oct. 16, 2019  Email, Grunsfeld Reply Decl., Ex. D, D.E 27-4.)   On October 18, 2019, Plaintiff's Counsel again emailed Defendants' counsel and asked, among other things, "where do we stand on the settlement?" (Oct. 18, 2019 Email, Prutzman Decl., Ex. 10, D.E. 21-10, at 1.)

---

[2] Neither party disputes the existence and substance of the Voicemail.

Defendants' counsel responded that Defendants terminated him as counsel, he had "no further authority to do anything on behalf of Defendants," and McCartharan "was unhappy that Mr. Lambot was being compelled to sign the settlement agreement." (Oct. 18, 2019 Email.) Defendants' counsel then advised the Court that he was "unconditionally discharged," sought leave to file a motion to withdraw as counsel, and requested to adjourn the initial conference. (Oct. 18, 2019 Ltr., D.E. 14; Grunsfeld Decl. ¶¶ 4-9.) Defendants' counsel explains that he was terminated because Defendants' believed that their insurance carrier "would assume responsibility for their defense." (Grunsfeld Decl. ¶ 9.)

On October 22, 2019, Plaintiff filed a letter indicating that it had "no objection to adjourning the initial conference" and took "no position on [Defendants' counsel's] motion to withdraw but requests that, if granted, the Court order defendants to retain new counsel within twenty (20) days so that resolution of this action will not be unduly delayed." (Oct. 22, 2019 Ltr., D.E. 15.) On October 22, 2019, the same day, Plaintiff filed a Request for a Certificate of Default, that was granted, because Plaintiff's Counsel viewed the Defendants' conduct as a bad faith attempt to avoid performing the settlement and delay the case. (Pl. Default Req., D.E. 16; Prutzman Decl. ¶ 20; see Default.) Judge Lindsay adjourned the initial conference to December 4, 2019, noting that: "four days after being notified that [Defendants'] counsel

intended to seek leave to withdraw, the plaintiff filed a request for a certificate of default, which was granted.  The parties may wish to address the entry of default in response to the anticipated motion for leave to withdraw." (Oct. 22, 2019 Elec. Order.) Defendants' counsel did not file a motion to withdraw because Defendants re-retained him after learning that "they did not have insurance coverage." (Grunsfeld Decl. ¶ 13.)  On October 25, 2019, Defendants' counsel informed Plaintiff's Counsel that Defendants wished to continue negotiations.  (Prutzman Decl. ¶ 21.)

The parties continued negotiations of a "new agreement" through November 2019, "without prejudice" to Plaintiff's position that there was "an enforceable settlement agreement." (Prutzman Decl. ¶¶ 21-23.)  On November 22, 2019, Defendants "made a final decision to contest this litigation." (Grunsfeld Decl. ¶¶ 14-15; Prutzman Decl. ¶ 23.)  Accordingly, on November 25, 2019, Defendants filed an Answer with Counterclaims (Answer, D.E. 18) and the current motion to set aside the Certificate of Default (see Defs. Mot.).  Plaintiff opposes the motion and filed a cross-motion to enforce the Final Draft and strike Defendants' Answer and Counterclaims as untimely.  (See Pl. Mot.)

DISCUSSION

I.   Plaintiff's Cross-Motion to Enforce a Settlement Agreement

     A. Legal Standard

          "A settlement agreement is a contract, no different in principle from any other." Lee v. Hosp. for Special Surgery, No. 07-CV-1117, 2009 WL 2447700, at *2 (S.D.N.Y. Aug. 11, 2009) (citing Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1985)). "[A]n oral settlement agreement to which a party intended to be bound 'is binding and conclusive . . . even if a party has a change of heart between the time of the agreement to the terms of the settlement and the time it is reduced to writing.'" Sugar v. Greenburgh Eleven Union Free Sch. Dist., No. 18-CV-0067, 2020 WL 2036853, at *2 (S.D.N.Y. Apr. 28, 2020) (quoting Elliot v. Cty. of N.Y., No. 11-CV-7291, 2012 WL 3854892, at *2 (S.D.N.Y. Sept. 5, 2012)) (ellipsis in original). "[D]istrict courts are empowered to enforce such settlement agreements summarily, although the Court naturally assumes that an evidentiary hearing would be necessary if there were a genuine issue as to a material fact." Lee, 2009 WL 2447700, at *1.

          The Second Circuit applies a "four-factor test to determine whether a party intended to be bound by the terms of an oral or unsigned settlement agreement:  whether (1) 'there has been an express reservation of the right not to be bound in the absence of a writing'; (2) 'there has been partial performance of

the contract'; (3) 'all of the terms of the alleged contract have been agreed upon'; and (4) 'the agreement at issue is the type of contract that is usually committed to writing.'"  Sugar, 2020 WL 2036853, at *2 (quoting Winston, 777 F.2d at 80); see also Acun v. Merrill Lynch, Pierce, Fenner & Smith, No. 18-CV-7217, 2020 WL 3002225, at *2 (S.D.N.Y. Jan. 15, 2020), R&R adopted, 2020 WL 995887 (S.D.N.Y. Mar. 2, 2020) (applying the Winston factors because "[d]istrict courts in this Circuit routinely apply only federal common law in cases when a motion is filed to enforce an oral settlement agreement.")  "No single factor is dispositive." Sugar, 2020 WL 2036853, at *2.

B. Analysis

Plaintiff argues that the parties entered into a binding settlement agreement (i.e., the Final Draft) when Defendants' counsel told Plaintiff's counsel "[w]e finally have a resolution" in the Voicemail. (Pl. Br. at 8.)  Defendants respond that (1) the parties reserved their rights to modify the terms of the settlement until execution of a written agreement (Defs. Reply at ECF pp. 3-4) and (2) the parties' conduct reflects that they did not intend to be bound by the Final Draft (Defs. Reply at ECF pp. 4-6).

1.   Express Reservation of the Right Not to Be Bound

"While no one Winston factor is decisive, 'where there is a writing between the parties showing that one party did not intend to be bound, a court need look no further than the first

8

factor.'"  Meltzer v. Stier, No. 15-CV-6184, 2017 WL 5032991, at *4 (S.D.N.Y. Nov. 2, 2017) (quoting Kaczmarcysk v. Dutton, 414 F. App'x 354, 355 (2d Cir. 2011)).  "Ultimately, the analysis turns on the parties' intent, and this can be demonstrated with equal force through their conduct."  Id. (citing Winston, 777 F.2d at 81 ("Although neither party expressly reserved the right not to be bound prior to the execution of a document, language in the correspondence does reveal such an intent.")).

Here, the first factor presents a close call.  Plaintiff maintains that the Voicemail, wherein Defendants' counsel stated "[w]e finally have a resolution," constitutes an oral agreement binding the parties to the Final Draft.  (Pl. Br. at 10; Pl. Reply at 4; Prutzman Decl. ¶ 17.)  While there is nothing in the Final Draft indicating that either "party expressly reserved the right not to be bound in the absence of a writing" and formal execution, the Court finds that "the words and conduct of the parties indicate that there was an implied reservation of such a right."  Sprint Commc'ns Co. L.P. v. Jasco Trading, Inc., 5 F. Supp. 3d 323, 332 (E.D.N.Y. 2014).

First, "statements like 'we have a deal' do not in themselves preclude a finding that the parties intended to be bound only by a formal written contract."  Davidson Pipe Co. Inc. v. Laventhol & Horwath, No. 84-CV-5192, 1986 WL 2201, at *5 (S.D.N.Y. Feb. 11, 1986).  Second, the Voicemail followed "weeks of

bargaining over the draft settlement." Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 325 (2d Cir. 1997). Third, the Final Draft contains a merger clause stating that "[t]his Settlement Agreement may be modified, varied or otherwise amended only by a writing, of even or subsequent date hereto, signed by each Party." (Final Draft, at ECF p. 6, ¶ 7.) The Second Circuit holds that "such a merger clause is persuasive evidence that the parties did not intend to be bound prior to the execution of a written agreement." Ciaramella, 131 F.3d at 324-25.

Finally, both Defense and Plaintiff's Counsel previously represented that approval of draft agreements was subject to their clients' approval. (See, e.g., July 8, 2019 Email, Grunsfeld Reply Decl., Ex. A, D.E. 27-1; Aug. 7, 2019 Email, Grunsfeld Reply Decl., Ex. B, D.E. 27-2.) What is more, assuming that the Voicemail is authentic and admissible, Defendants' counsel qualified his statement that "[w]e finally have a resolution" with "hopefully we can get this [action] squared away within a day or two." (See Voicemail, Prutzman Decl., ¶ 16) (emphasis added). Thus, the "Court finds that any settlement was conditional upon further discussion between counsel for the parties." Hawkins on behalf of MedApproach, L.P. v. MedApproach Holdings, Inc., No. 13-CV-5434, 2018 WL 1371404, at *3 (S.D.N.Y. Jan. 9, 2018), R&R Adopted, 2018 WL 1384502 (S.D.N.Y. Mar. 15, 2018). Further, the implication that no agreement had been reached is confirmed by

Plaintiff's Counsel's conduct who, after sending the Final Draft, twice inquired where Defendants "stand on the settlement." (See Oct. 16, 2019 Email; Oct. 18, 2019 Email.) Accordingly, "any indication that [Defendants' counsel's] oral acknowledgement was meant to bind the parties prior to full document execution was neutralized." Davidson, 1986 WL 2201, at *5; Ciaramella, 131 F.3d at 324-25 (quoting R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 76 (2d Cir. 1984)) (further citations omitted) (stating that an "attorney's statement that 'a handshake deal' existed was insufficient to overcome 'months of bargaining where there were repeated references to the need for a written and signed document, and where neither party had ever . . . even discussed dropping the writing requirement."); see Sprint Commc'ns, 5 F. Supp. 3d at 335.

As such, this factor suggests that the parties intended to be bound by a fully executed, written agreement. See VPP, Inc. v. Field, No. 03-CV-4232, 2006 WL 4730944, at *2-3 (E.D.N.Y. Nov. 16, 2006) (finding the parties' emails, wherein counsel stated "we have a deal" revealed "the parties' intent not to be bound prior to execution of a stipulation of settlement."); LiDestri Foods, Inc. v. 7-Eleven, Inc., No. 17-CV-6146, 2019 WL 6875236, at *7 (W.D.N.Y. Dec. 16, 2019).

2.   Partial Performance

Plaintiff argues, without citation, that Defendants partially performed under the Final Draft because they agreed to

11

change their business name and retained Defendants' counsel to "accomplish one of their obligations under the settlement"-- registering a new corporation. (Pl. Reply at 4-5.) This factor weighs against enforcement because there is no evidence that Defendants actually began the process of changing the business name or registering a new corporation. To the contrary, the email Plaintiff cites as "proof" of partial performance states: "[o]nce we have an agreement in place, [Defendants] will take immediate steps to shift his business to a new name . . . (he has retained our office to register a new corp name and we will be working on that as soon as a settlement is in place.)" (See July 31, 2019 Email) (emphasis added). Further, Defendants' representation that they intended to use their already-retained counsel to "accomplish goals" under a settlement agreement hardly constitutes partial performance. See, e.g., Gorodensky v. Mitsubishi Pulp Sales (MC), Inc., 92 F. Supp. 2d 249, 256 (S.D.N.Y.2000) ("[P]artial performance of the contract must secure a benefit to the other party . . . .") (emphasis added).

Moreover, the Court rejects Plaintiff's argument that drafting and circulating the Final Draft constitutes partial performance because "an agreement by attorneys on the division of labor and the drafting of paperwork is not partial performance of an oral contract." (See Pl. Br. at 10-11); Stewart v. City of N.Y., No. 15-CV-7652, 2017 WL 4769396, at *3 (S.D.N.Y. Oct. 20,

2017), R&R adopted, 2017 WL 5897442 (S.D.N.Y. Nov. 29, 2017). Finally, the fact that Plaintiff did not "pursue active litigation" is "neutral with respect to the enforceability of the settlement." (See Pl. Br. at 10-11); Lopez v. City of N.Y., 242 F. Supp. 2d 392, 393-94 (S.D.N.Y. 2003). On balance, this factor tips in favor of Defendants.

### 3.   Agreement as to all Material Terms

"The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution," Winston, 777 F.2d at 82 (internal quotation marks and citation omitted), and "even 'minor' or 'technical' changes arising from negotiations over the written language of an agreement can weigh against a conclusion that the parties intended to be bound absent a formal writing" Powell, 497 F.3d at 130. "More generally, in analyzing this factor, courts have focused on whether the parties reached an agreement with respect to all material or essential terms." Galanis v. Harmonie Club of the City of N.Y., No. 13-CV-4344, 2014 WL 4928962, at *10 (S.D.N.Y. Oct. 2, 2014) (citing cases). "A factor is whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to." Johnson v. Fordham Univ., No. 11-CV-4670, 2016 WL 450424, at *5 (S.D.N.Y. Feb. 4, 2016) (internal quotation marks, brackets, and citations omitted).

Here, as of the date of the Voicemail, there was an alleged agreement regarding terms of prior settlement drafts.  It is true that after "a party agrees to the settlement terms, either orally or in writing, that party's later change of heart will not frustrate the agreement's enforceability." See Conway v. Brooklyn Union Gas Co., 236 F. Supp. 2d 241, 251 (E.D.N.Y. 2002).  However, after receipt of the Final Draft, Defendants sought to remove Lambot from the settlement and the parties exchanged drafts of a "new agreement." (See Background, supra.)  Neither party provided the Court with the draft agreements exchanged before or after the Voicemail.  Therefore, the Court cannot determine whether the parties agreed to all material or essential terms, including whether Lambot remained a signatory to the agreement. Thus, this factor is neutral.

4.   The Type of Agreement Usually Committed to Writing

"Settlements of any claim are generally required to be in writing or, at a minimum, made on the record in open court." Ciaramella, 131 F.3d at 326.  Further, "[w]here, as here, the parties are adversaries and the purpose of the agreement is to forestall litigation, prudence strongly suggests that their agreement be written in order to make it readily enforceable, and to avoid still further litigation." Winston, 777 F.2d at 83.

Defendants agree that the settlement "was reduced to a writing" in the form of the Final Draft. (Pl. Br. at 11.)  Thus,

14

the Court questions whether this factor is neutral.  However, "[t]he complexity of an agreement also informs the determination of whether it would be expected to be reduced to writing."  Ray Legal Consulting Grp. v. DiJoseph, No. 13-CV-6867, 2016 WL 1451547, at *8 (S.D.N.Y. Apr. 12, 2016) (collecting cases).  Here, like in Winston, the Final Draft spans five pages and contains "obligations that would extend for a period of years," if not in perpetuity, and is therefore "an agreement complex enough to require a writing."  Id. (citing Winston, 777 F.3d at 83).  Therefore, the final factor supports the conclusion that the parties did not enter into an enforceable agreement.

Because three of the four Winston factors weigh against enforcement of the Final Draft, and considering the circumstances specific to this matter, the Court finds that the Voicemail did not bind the parties to the terms of the Final Draft.

II.  Defendants' Motion to Vacate the Certificate of Default

Pursuant to Federal Rule of Civil Procedure 55(c), the Court "may set aside an entry of default sua sponte for good cause."  Negrin v. Kalina, No. 09-CV-6234, 2012 WL 4074992, at *2 (S.D.N.Y. Sept. 11, 2012); see FED. R. CIV. P. 55(c).  "Relief from default under Rule 55(c) is to be granted at the discretion of the court upon consideration of the individual circumstances of the case and the credibility and good faith of the parties."  Weisel v. Pischel, 197 F.R.D. 231, 238 (E.D.N.Y. 2000).  Moreover, "the

standard for setting aside the entry of a default pursuant to Rule 55(c) is less rigorous than the . . . standard for setting aside a default judgment . . . pursuant to Rule 60(b)." <u>Grosso v. Radice</u>, No. 07-CV-3620, 2007 WL 4441022, at *1 (E.D.N.Y. Dec. 10, 2007) (internal quotation marks and citations omitted).  To evaluate good cause, the Court considers: "'(1) whether the default was willful; (2) whether setting aside the default would prejudice the party for whom default was awarded; and (3) whether the moving party has presented a meritorious defense.'" <u>Murray Eng'g, P.C. v. Windermere Props. LLC</u>, No. 12-CV-0052, 2013 WL 1809637, at *3 (S.D.N.Y. Apr. 30, 2013) (quoting <u>Peterson v. Syracuse Police Dep't</u>, 467 F. App'x 31, 33 (2d Cir. 2012)).  When considering these factors, if "'doubt exists as to whether a default should be granted or vacated, the doubt should be resolved in favor of the defaulting party.'" <u>Murray</u>, 2013 WL 1809637, at *3 (quoting <u>Enron Oil Corp. v. Diakuhara</u>, 10 F.3d 90, 96 (2d Cir. 1993)).  The Second Circuit has made clear that it prefers that disputes "'be resolved on the merits, not by default.'" <u>Jenn-Ching Luo v. Baldwin Union Free Sch. Dist.</u>, No. 12-CV-3073, 2014 WL 3943099, at *4 (E.D.N.Y. Aug. 12, 2014), aff'd, 677 F. App'x 719 (2d Cir. 2017) (quoting <u>Azikiwe v. Nigeria Airways Ltd.</u>, No. 03-CV-6387, 2006 WL 2224450, at *1 (E.D.N.Y. July 31, 2006)).

Here, the parties engaged in settlement discussions for approximately five to six months.  Although the parties did not

file a formal stipulation, on August 23, 2019, Plaintiff agreed to extend Defendants' time to answer the Complaint "so we can get this settled." (See Aug. 23, 2019 Email.) Plaintiff filed its request for a certificate of default on the same day it requested that the Court provide Defendants twenty days to retain new counsel "so that resolution of this action will not be unduly delayed." (Oct. 22, 2019 Ltr.) Thus, the default was not willful. See Lighting & Supplies, Inc. v. Sunlite USA Corp., No. 14-CV-4344, 2015 WL 3795858, at *4 (E.D.N.Y. June 17, 2015) (collecting cases); Westchester Fire Ins. Co. v. Tyree Serv. Corp., 304 F.R.D. 111, 112 (E.D.N.Y. 2014).

Next, vacating the default judgment will not cause substantial prejudice to Plaintiff where, as here, the case is in its infancy and the parties have not yet engaged in discovery. See Westchester Fire, 304 F.R.D. at 114. Indeed, "[t]he fact that the Plaintiff previously engaged in unsuccessful settlement negotiations regarding this dispute does not, without more, constitute prejudice for purposes of Rule 55." Id.

Finally, Defendants have filed an Answer with Counterclaims and have provided the Court with a meritorious defense. Plaintiff argues that the defense "is palpably meritless and frivolous" because "documentary evidence shows that Plaintiff has been using the LION-AIRE mark and logo in commerce at all times relevant to this action." (Pl. Br. at 14-15.) However,

"[l]ikelihood of success is not the measure. [Defendants'] allegations are meritorious if they contain even a hint of a suggestion which, proven at trial, would constitute a complete defense." Weisel, 197 F.R.D. at 239 (internal quotation marks and citation omitted).

Accordingly, the certificate of default is VACATED.

### III. Plaintiff's Request to Strike Defendants' Answer and Counterclaims

Motions to strike "call for an extreme remedy, and therefore they are disfavored and rarely granted." Simon v. City of N.Y., No. 09-CV-1302, 2011 WL 317975, at *3 (E.D.N.Y. Jan. 3, 2011), R&R adopted, 2011 WL 344757 (E.D.N.Y. Feb. 1, 2011). In light of Defendants' participation in settlement negotiations, correspondence between Counsel, and the "strong public policy favoring resolving disputes on the merits," the Court declines to exercise its discretion to grant Plaintiff's request to strike Defendants' Answer and Counterclaims as untimely. (See Pl. Br. at 12-13); Panzella v. Cty. of Nassau, No. 13-CV-5640, 2015 WL 224967, at *1 (E.D.N.Y. Jan. 15, 2015) (internal quotation marks and citation omitted) (alterations in original) (collecting cases).

### CONCLUSION

While the Court does not fault the parties for making motions in good faith, the parties are advised that further dilatory conduct, whether with respect to settlement negotiations

or litigation, will not be tolerated.  Accordingly, for the foregoing reasons, Defendants' motion is GRANTED and Plaintiff's cross-motion is DENIED.  The Clerk of the Court is directed to VACATE the Certificate of Default.


                              SO ORDERED.


                              /s/ JOANNA SEYBERT
                              Joanna Seybert, U.S.D.J.


Dated:      July   8  , 2020
            Central Islip, New York